UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DERRICK D. COLEMAN,

            Plaintiff,

v.

KAREN S. RICH, *et al.*,

            Defendants.

_____/

Case No. 1:14-cv-681

Hon. Robert J. Jonker

## REPORT AND RECOMMENDATION

This is a *pro se* civil rights action brought by a state prisoner at a Michigan

Department of Corrections (MDOC) facility pursuant to 42 U.S.C. § 1983. This matter is now

before the Court on motions for summary judgment filed by defendants Dykstra, Rich, Smith and

Stieve (referred to collectively as the "MDOC defendants") (docket no. 28), plaintiff (docket no. 32)

and defendant Harriet Squier (docket no. 38)[1], and plaintiff's "Motion to obtain deposition(s) not

available without a court order" (docket no. 37).

### I.       Plaintiff's amended complaint

The Court previously summarized the claims set forth in plaintiff's amended

complaint as follows:

> Plaintiff Derrick D. Coleman is incarcerated by the Michigan Department of
> Corrections (MDOC) at the Muskegon Correctional Facility (MCF), where the events
> giving rise to his complaint occurred. In his amended complaint, he sues the
> following MDOC employees at MCF: Officers R. Dykstra and (Unknown) Smith;
> Housing Unit Manager (HUM) J. Winger; Warden Sherry L. Burt; and Nurse Karen
> S. Rich. He also sues Dr. (Unknown) Stieve, the Chief Medical Officer for the

_____

[1] The Court notes that defendant Dr. Harriet Squier appears on the docket sheet and in the amended
complaint as "Harriet Sqier."

MDOC, and the following employees of Corizon, Inc.: Chief Executive Officer (CEO) Richard Hallworth and Dr. Harriet Sqier.

Plaintiff alleges that he broke his right forearm at around 7:00 on the evening of May 31, 2013, while participating in recreational activities at MCF. He informed Officers Dykstra and Smith that he injured his arm, and they could see that his forearm was "injured/deformed," so they contacted healthcare services. (Am. Compl. 2, docket #6.) There were no available "Qualified Health Care Professionals" at the facility at that time, but Plaintiff was allowed to speak with Nurse Rich over the telephone. He told her that he was in severe pain and that he could feel his bones "clicking" inside his forearm. (*Id.*) She told him that she could not assess him at that time because she was located at a different facility, the Brooks Correctional Facility (LRF). He told her that he could not make it through the night without some medical treatment, but she told him to "take it easy" and to lie down as comfortably as possible until the following morning. (*Id.* at 3.) She said that the best she could do for him was to have the unit officers give him some ice. (*Id.* at 14.)

That night, Plaintiff repeatedly complained to Officers Dykstra and Smith that he was in severe pain, but they told him to return to his cell. He claims that they should have prepared a "Critical Incident Report" in accordance with MDOC Policy Directive 01.05.120, which would have "mandated and precipitated" an urgent response by healthcare services. (*Id.* at 11.)

At around 8:00 the next morning, Plaintiff was seen by Nurse Cooper, who determined that Plaintiff had broken his arm. She put his arm in a sling and gave him some ice and ibuprofen. She also telephoned Dr. Nelson to inform him that Plaintiff needed urgent medical treatment. Dr. Nelson informed Nurse Cooper that he wanted to evaluate Plaintiff in two days' time, on June 3, 2013. For the rest of the day and that evening, Plaintiff was in severe pain. The next day, he did not see any medical staff, even though he repeatedly complained about his pain to housing unit staff.

On June 3, 2013, at about 10:00 in the morning, he met with Dr. Nelson. Dr. Nelson examined Plaintiff and determined that he had broken his right ulna. Dr. Nelson immediately called Drs. Stieve and Sqier to arrange a consultation for urgent medical treatment. Dr. Nelson also gave Plaintiff a stronger pain medication and called a local hospital to arrange for surgery. Defendants Stieve and Sqier denied the request for urgent treatment, however, and Plaintiff was told to return to his cell.

Plaintiff did not see any medical personnel the following day. On June 5, 2013, Plaintiff was taken to LRF for an x-ray. The x-ray confirmed that Plaintiff had broken his ulna, but again, Plaintiff was denied urgent medical treatment and told to return to his cell to endure another full day of pain.

On June 6, 2013, Plaintiff received more x-rays and a visit with a surgeon. The x-rays showed that Plaintiff had broken his elbow as well as his arm. Based on the new results, Plaintiff was approved for surgery. The surgeon implanted a steel plate in Plaintiff's forearm and reconstructed his elbow. Plaintiff saw the surgeon again on June 20, 2013, to have staples removed from his arm. Plaintiff asserts that he has not received "extensive" physical therapy and has not regained full mobility of his arm. (Am. Compl. 6, docket #1.)

In August 2013, after Plaintiff requested a copy of the critical incident report for his injury, the assistant Housing Unit Manager in Plaintiff's unit asked Defendants Smith and Dykstra to prepare a back-dated report. They refused to do so, and HUM Winger told them that they did not need to be involved.

Based on the foregoing allegations, Plaintiff claims that Defendants were deliberately indifferent to his serious medical needs. In addition, Plaintiff asserts that HUM Winger attempted to cover up an investigation into the incident leading to Plaintiff's injury, and that Warden Burt failed to properly train her subordinates to handle situations that require urgent care.

Plaintiff also claims that the lack of adequate staffing at MCF on May 31, 2013 (according to Plaintiff, there was no nurse on duty from 10:00 pm to 6:00 am) violated MDOC Policy Directive 03.04.100, which requires that urgent conditions be treated as soon as possible.

Opinion (docket no. 8, PageID.62-64) (internal footnotes omitted).

The Court dismissed defendants Hallworth, Winger and Burt for failure to state a claim upon which relief can be granted pursuant to 28 U.S.C. §§ 1915(e) and 1915A, and 42 U.S.C. § 1997e(c). *See* Opinion and Order (docket nos. 8 and 9). In reaching this determination, the Court found that "[p]laintiff does not have a constitutional right to obtain a written incident report from prison officials; thus, Winger did not violate his rights by preventing Officers Dykstra and Smith from signing one." Opinion at PageID.67-68. The only claims remaining before the Court are plaintiff's Eighth Amendment claims: that Nurse Rich refused to assess plaintiff or offer him treatment on May 31, 2013, after he complained that he was in severe pain and could feel the bones in his arms clicking; that Officers Dykstra and Smith failed to prepare a report which would have

required an urgent response from healthcare and failed to respond to his ongoing requests for care even though he complained about severe pain and they could see that his arm was injured; and that Drs. Stieve and Squier twice denied urgent medical treatment for the break in his arm even after such treatment was requested by an examining physician and the break was confirmed by an x-ray; and that as a result of the delay in care, plaintiff alleges that he suffered significant pain and discomfort from May 31 to June 6, 2013, when he was approved for surgery. *Id.* at PageID.68. Accordingly the Court found that "[a]t this stage of the proceedings . . . Plaintiff's allegations are adequate to state an Eighth Amendment claim against Defendants Dykstra, Smith, Rich, Stieve and Sqier. *Id.*

## II. Plaintiff's motion for deposition(s)

### A. Legal standard

In response to the MDOC defendants' motion for summary judgment, plaintiff filed his own motion for summary judgment and a "motion for deposition(s)" asking the Court for a continuance "to enable depositions to be taken essential to justify its [sic] opposition for Summary Judgement." Motion for deposition(s) at PageID.314. In this motion, plaintiff contends that he needs the depositions of non-parties Dr. Nelson, Nurse Cooper, Officer Flaquel and Officer Worel to respond to the MDOC defendants' motion for summary judgment. Plaintiff's "motion for deposition(s)" appears to seek relief under Fed. R. Civ. P. 56(d), which provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate

order." Fed. R. Civ. P. 56(d).[2] The trial court's allowance of additional discovery under Fed. R. Civ. P. 56(d) (formerly Rule 56(f)) is discretionary. *Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 416 (6th Cir. 2009). "The affidavit required by [former] Rule 56(f) to support a request for additional discovery must indicate the need for discovery, what material facts may be uncovered, and why the information has not been previously discovered." *Id.* The Sixth Circuit has cautioned that when the parties have no opportunity for discovery, denying a motion under Rule 56(d) and ruling on a summary judgment motion is likely to be an abuse of discretion. *Siggers v. Campbell*, 652 F.3d 681, 695-96 (6th Cir. 2011). However, "[i]t is not an abuse of discretion for the district court to deny the discovery request when the party makes only general and conclusory statements [in its affidavit] regarding the need for more discovery and does not show how an extension of time would have allowed information related to the truth or falsity of the [document] to be discovered." *Ball v. Union Carbide Corp.*, 385 F.3d 713, 720 (6th Cir. 2004). Here, plaintiff has had an opportunity for discovery, and both Dr. Squier and the MDOC defendants' responded to plaintiff's interrogatories and requests for production of documents before filing their respective motions for summary judgment. *See* Certificates of Service (docket nos. 23, 27 and 31).

**B.    Plaintiff's supporting declaration**

As an initial matter, plaintiff submitted an unsworn declaration in support of his motion. However, this declaration was not adequate to obtain relief under Fed. R. Civ. P. 56(d). Plaintiff submitted the declaration pursuant to 28 U.S.C. § 1746, which provides that in any matter which "is required or permitted to be supported, evidenced, established, or proved by the sworn

---

[2] The Court notes that plaintiff cites Fed. R. Civ. P. 56(f)(2), the predecessor to  Fed. R. Civ. P. 56(d).

declaration . . . in writing of the person making the same . . . may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration . . . in writing of such person which is subscribed by him, as true under penalty of perjury." 28 U.S.C. § 1746(2). Such statements must be made in substantially the following form "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)". 28 U.S.C. § 1746(2).

Here, plaintiff created his own version of the statutory verification, stating:

> I have read the forgoing [sic] motion and hereby verify that the matter [sic] alleged are true, except as to matters alleged on information and belief, and as to those, I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct.

Motion at PageID.317. The Court does not view this statement as a declaration authorized by 28 U.S.C. § 1746. Plaintiff did not state that the matters set forth in the motion were "true and correct" but diluted the language to include matters alleged on information and belief. In addition, plaintiff did not designate which statements in his motion were based on personal knowledge and which were based on information and belief. Accordingly, plaintiff's motion can be denied on this ground.

### C. Plaintiff has made only conclusory and general statements regarding the proposed discovery

In addition, even if plaintiff had provided an adequate declaration, he did not indicate what material facts might be uncovered by deposing non-parties Dr. Nelson, Nurse Cooper, Officer Flaquel and Officer Worel. *See Egerer*, 556 F.3d at 416. The MDOC defendants seek summary judgment on two grounds: lack of exhaustion of administrative remedies and failure to establish an Eighth Amendment violation. *See* Motion for summary judgment and brief (docket nos. 28 and 29). Plaintiff demonstrated that he had sufficient information to respond to the MDOC defendants'

motion, having filed a counter-motion for summary judgment which he supported with an affidavit and 35 exhibits related to the incident. *See* Affidavit and Exhibits (docket nos. 33, 33-1, 33-2 and 33-3). Those exhibits included copies of relevant grievances, policy directives, medical records related to his injury, and interrogatory responses from defendants Officer Dykstra, Officer Smith and RN Rich. *See* Exhibits (docket nos. 33-1, 33-2 and 33-3).

Despite having filed his own motion for summary judgment, plaintiff contends that the deposition testimony of non-party Nurse Cooper and Dr. Nelson are vital to his opposition to the MDOC defendants' motion because Nurse Cooper was the first person to personally examine his arm on June 1st and Dr. Nelson requested urgent treatment for the arm on June 3rd. Nurse Cooper and Dr. Nelson's treatment of plaintiff are undisputed. Plaintiff does not identify any additional information which Nurse Cooper and Dr. Nelson could provide which was vital to oppose the MDOC defendants' motion. In this regard, plaintiff does not address the evidence which he seeks to obtain or the evidence which he seeks to rebut. Plaintiff also contends "[t]hat Officer Flaquel must be deposed to ascertain information concerning policy as it relates to policy and protocol." This information is not relevant to plaintiff's action. As discussed, *supra*, the Court dismissed plaintiff's claims regarding an alleged MDOC policy violation. Finally, plaintiff states that "Officer Worel must be deposed as his intimate relationship with the incident will prevail certain subjective ramification [sic] available for Plaintiffs [sic] Opposition to Summary Judgment relief." Plaintiff, however, provides no information as to non-party Officer Worel's involvement in this matter and what material facts would be uncovered by deposing him. Accordingly, plaintiff's motion for deposition(s) should be denied.

### III.   The motions for summary judgment

### A.   Legal standard

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws.  *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984);  *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996).  To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law.  *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case.  Once the moving party has met its burden of

> production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B.     The MDOC defendants

Both the MDOC defendants and plaintiff have moved for summary judgment with respect to the issue of exhaustion. The MDOC defendants contend that plaintiff's claims against them are unexhausted, while plaintiff contends that his claims against them are exhausted based upon a grievance which defendants did not identify.

### 1.     Exhaustion requirement

The PLRA provides that a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). A prisoner must exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S.

at 741. One reason for creating prisoner grievance procedures under the PLRA was to create an administrative record for the court.

> Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court. This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record.

*Jones v. Bock*, 549 U.S. 199, 204 (2007). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Id.* at 218; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218.

## 2.      MDOC Grievance process

The MDOC requires prisoners to follow a three-step process to exhaust grievances. *See* Policy Directive 03.02.130 (effective July 9, 2007). A prisoner must first attempt to resolve a problem with the staff member within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control. *Id.* at ¶ P. If the issue is not resolved, then the grievant may file a Step I grievance on the prescribed form within five business days after the grievant attempted to resolve the issue with appropriate staff. *Id.* at ¶¶ P and R. The Policy Directive provides the following directions for completing grievance forms:

> The issues should be stated briefly but concisely. Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included.

*Id.* at ¶ R (emphasis in original). The prisoner must send the Step I grievance to the appropriate grievance coordinator. *Id.* at ¶ V. If the prisoner is dissatisfied with the Step I response, or does not

receive a timely response, he must request the appropriate form and send it to the Step II Grievance Coordinator. *Id.* at ¶ BB. Finally, if a prisoner is dissatisfied with the Step II response, or does not receive a timely response, he must send a completed Step III grievance, using the appropriate form, to the Grievance and Appeals Section. *Id.* at ¶ FF.

### 3. Plaintiff failed to properly exhaust his claims against the MDOC defendants

The record reflects that plaintiff filed three Step III grievance appeals while incarcerated at MCF. *See* MDOC Step III Grievance Report (docket no. 29-3, PageID.155-157). Two of those grievances, MCF-13-08-1300-7f ("1300") and MCF 13-07-1190-12z ("1190") are unrelated to the present action. *See* Grievance 1300 (dated August 22, 2013, requesting a copy of the critical incident report or accident report regarding his injuries) (*id.* at PageID.158-162); Grievance 1190 (complaining that his July 3, 2013 request for a copy of all of his x-rays was denied) (*id.* at PageID.163-167). The third grievance, MCF-14-07-721-28e ("721"), was filed on July 31, 2014, more than one month after plaintiff filed this action. *See* MDOC Step III Grievance Report at PageID.156. Even if grievance 721 could be construed as related to the incidents which occurred in May and June 2013 (more than one year prior to its filing), this grievance was not exhausted before plaintiff filed this lawsuit. *See Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir.1999) (a prisoner "may not exhaust administrative remedies during the pendency of the federal suit"). Based on the grievance record presented by defendants, there is no evidence that plaintiff filed any grievances against them related to the Eighth Amendment violations which allegedly occurred between May 31, 2013 and June 6, 2013.

In his motion for summary judgment, plaintiff submitted an affidavit and other documents which reflect that he filed a grievance (MCF-2013-06-09-983-12e ("983")) regarding these incidents on June 14, 2013. *See* Coleman Aff. (docket no. 33, PageID.218-219). Grievance 983 did not name any of the defendants, but referred only to deliberate indifference by unknown individuals or "medical personnel". Grievance 983 (docket no. 33-2 at PageID.227-228). The only individuals named in the grievance are non-parties RN Cooper and Dr. Nelson. *Id.* The grievance was denied as Step I, with the respondent and reviewer concluding that no delay in treatment occurred. *Id.* at PageID.229. The Step II Appeal was neither granted nor denied. Rather, on August 13, 2013, an extension was approved for the response and the grievance was "referred for Quality Assurance purposes at the facility level." *Id.* at PageID.235. Plaintiff also presented evidence indicating that he submitted a Step III appeal dated August 27, 2013 but that MDOC personnel did not receive it. *Id.* at PageID.236-250. Based on this record, questions of fact exist with respect as to whether plaintiff appealed grievance 983 to Step III.

However, even if plaintiff had exhausted grievance 983 through Step III, the grievance was not properly exhausted because it did not name any of the defendants in this action. *See* Grievance 983 at PageID.227-228; Policy Directive 03.02.130 ¶ R ("Dates, times, places and names of all those involved in the issue being grieved are to be included" on the grievance form). While the grievance named two-non-parties who cared for plaintiff, the grievance did not name any of the defendants who were allegedly deliberately indifferent to his medical needs. Rather, plaintiff referred to unnamed guards, unknown individuals, "medical staff" and "medical personnel". *See* Grievance 983 at PageID.227-228. Even if plaintiff had exhausted grievance 983 through Step III, he did not properly exhaust his claims against defendants, none of whom were named in the

grievance. A grievance which did not include the names of the defendants but referred only to unnamed "medical staff" failed to comply with Policy Directive 03.02.130 ¶ R and was not properly exhausted. *Drain v. Burke*, No. 1:13-CV-1326, 2015 WL 1323366 at *7 (W.D. Mich. Mar. 24, 2015). *See also*, *Stone v. Crompton*, No. 1:11-cv-821, 2012 WL 3779935 at *3 (Report and Recommendation) (W.D. Mich. Aug. 2, 2012), adopted in 2012 WL 3779930 (Order) (Aug. 31, 2012) (simply referring to a correctional facility's "health care staff" fails to name a particular party grieved, does not comply with Policy Directive 03.02.130 ¶ R, and fails to properly exhaust a claim against any particular person). For these reasons, plaintiff has failed to properly exhaust a grievance against defendants Dykstra, Rich, Smith and Stieve. *See Jones*, 549 U.S. at 218; *Woodford*, 548 U.S. at 90-91. Accordingly, defendants Dykstra, Rich, Smith and Stieve are entitled to summary judgment for lack of exhaustion.[3]

### C.    Eighth Amendment claim against Dr. Squier

### 1.    Deliberate indifference

Dr. Squier moved for summary judgment on the merits of plaintiff's Eighth Amendment claim. Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution

---

[3] Because the MDOC defendants have demonstrated that plaintiff did not exhaust his administrative remedies, the undersigned has not addressed defendants' motion with respect to the merits of plaintiff's claims.

and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

Here, plaintiff has alleged that defendants were deliberately indifferent to his serious medical needs. It is well established that an inmate has a cause of action under § 1983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (1976). A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Id.* at 8-9. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Id.* at 835. "It is obduracy and wantonness, not

14

inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

Dr. Squier is a physician licensed to practice medicine in Michigan. *See* Squier Declaration (docket no. 38-3, PageID.338). She did not treat plaintiff's medical condition at the correctional facility. *Id.* at PageID.338-340. In her position as a Utilization Medical Director at Corizon Health, Inc., she sometimes reviewed and responded to requests for consultations with outside medical professionals for inmates incarcerated at the MDOC, and reviewed patient files when there was a question regarding care. *Id.* at PageID.338.

The record reflects that on Saturday, June 1, 2013 at 2:59 a.m., plaintiff kited the prison healthcare services complaining that he suffered an elbow injury at approximately 6:30 p.m. the previous day during a basketball game. *Id.* at PageID.339; Medical Record (docket no. 40-1, PageID.354). Plaintiff was triaged by nursing staff via telephone at 3:05 a.m. Medical Record at PageID.354. When asked why he waited so long to contact healthcare services, plaintiff stated that his elbow had been okay until after he showered at which point he noticed it was swollen. *Id.* When plaintiff was examined post-surgery on June 7, 2013, he reported that the injury actually occurred when another inmate hit him in the arm with a baseball bat.[4] Nevertheless, the record reflects that plaintiff was treated based upon his report that the injury occurred during a basketball game. Medical Record at PageID.354. Plaintiff reported that he could move all of his fingers, denied any

---

[4] When RN Cooper asked plaintiff how he could sustain such an injury without any pain or discomfort as stated in the original report, plaintiff admitted that the injury occurred under different circumstances: that he was part of an inmate "brawl;" that a " 'friend' mistakenly hit him in the arm with a bat while intending to hit one of the inmates that they were fighting against;" and, that "he did not want to report the incident to custody because he did not want to be placed in segregation or miss the family visit that he had scheduled that day." Medical Record at Page ID.393.

numbness or tingling, and did not report that his hand was discolored. *Id.* Defendant RN Rich instructed plaintiff to place ice on his injury, keep it elevated, take Motrin or Tylenol for pain if available, and to contact medical in the morning if he was not better at that time. *Id.* He was also instructed to contact medical sooner if his symptoms changed or became worse. *Id.*

Plaintiff was seen by nursing staff at 7:54 a.m., at which time plaintiff reported that he fell on his arm while playing basketball, that he had a pain level of 7 out of 10, and that he had been applying ice overnight. Squier Decl. at PageID.339-340; Medical Record at PageID.355. Plaintiff reported that when he woke up, the pain and swelling had become severe. *Id.* Examination of his right forearm revealed severe swelling, warmth and redness, with limited range of motion and a firm, tender mass. *Id.* At that time, plaintiff's arm was stabilized with a splint, ace wrap and arm sling. *Id.* Plaintiff was prescribed pain medication, instructed to keep his arm elevated, instructed to apply ice, and given triple antibiotic ointment for an abrasion to prevent infection. *Id.* The nursing staff also consulted with the on-call physician to rule out the need for an immediate x-ray offsite. *Id.* Plaintiff was told that he would be assessed by a medical provider at the facility and an x-ray would then be performed onsite if indicated. *Id.* Plaintiff was instructed to contact healthcare if he suffered any worsening symptoms prior to seeing the medical provider. *Id.* Plaintiff was scheduled to be seen for an urgent follow up appointment on Monday, June 3, 2013 for possible fracture. *Id.* In the meantime, he would continue to be monitored and was given a temporary lay-in restricting him from work assignment and allowing him to eat meals in the housing unit. *Id.*

Plaintiff was seen by a physician, Dr. Nelson, at 10:26 a.m. on June 3rd. Squier Decl. at PageID.340; Medical Record at PageID.359-362, 467. A physical evaluation revealed swelling of his proximal forearm and pain with flexion or rotation. *Id.* Plaintiff described the pain as

moderate and worse with movement, and reported that his associated symptoms included "popping." *Id.* Dr. Nelson prescribed additional pain medication and submitted a request for an offsite orthopedic consultation to evaluate and treat plaintiff for a presumed diagnosis of right forearm fracture. *Id.* At that time, an x-ray had not yet been performed. *Id.* Dr. Nelson requested an orthopedic consultation with Dr. Fett, noting that with expedited approval plaintiff could be seen the next day. *Id.*

Dr. Squier reviewed and responded to the specialty consultation request within hours with instructions for an alternative treatment plan. Squier Decl. at PageID.340; Medical Record at PageID.366. Dr. Squier explained:

> I directed that the onsite provider submit for an urgent x-ray and review onsite to confirm whether there was in fact a fracture as no diagnosis of fracture had been made at that time. In the absence of a fracture diagnosis or other results from diagnostic testing, the need for an orthopedic referral was not demonstrated. In fact, even if Mr. Coleman had a fracture, not all fractures would require offsite treatment. I noted at that time that minimally displaced radial head fractures, for instance, could be managed on-site, so the results of Mr. Coleman's x-ray would need to be reviewed before determining if an orthopedic referral was necessary.

*Id.* at PageID.340-31; Medical Record at PageID.366-367.

The onsite provider, Dr. Nelson, ordered an x-ray which was performed on June 5, 2013. Squier Decl. at PageID.341; Medical Record at PageID.368. Prior to the scheduled x-ray (i.e., on June 3rd), plaintiff had his splint and sling in his pants pocket and reported that he was not wearing his splint and sling while in the housing unit. Squier Decl. at PageID.341; Medical Record at PageID.370. On the date of the x-ray, plaintiff reported that he was not wearing his sling because it "pinches" his arm and that he was not taking his prescription pain medication because it caused him to be "dopey" and vulnerable. Squier Decl. at PageID.341; Medical Record at PageID.375, 467.

When the x-rays performed on the morning of June 5th revealed a displaced and comminuted fracture of the right ulna, Dr. Nelson submitted a consultation request seeking an expedited referral to an outside orthopedist, which Dr. Squier "immediately" approved. Squier Decl. at PageID.341-342; Medical Record at PageID.371-373, 379-382. The next day, plaintiff was seen by an orthopedic surgeon. As Dr. Squier explained:

> Mr. Coleman was seen by an orthopedic surgeon June 6, 2013 who recommended urgent surgical repair. (Exhibit A, pp. 31-36, 95-97, 100) [Medical Record at PageID.383-388, 447-449, 452]. Mr. Coleman's medical provider contacted me by telephone while Mr. Coleman was still at the orthopedist's office seeking approval for the recommended surgery. (*Id.*, p. 34) [PageID.386]. I gave verbal authorization for the recommended ORIF surgery to be immediately performed. (*Id.*) The surgery was then performed that same day. (*Id.*, pp. 98, 101-103) [PageID.450, 453-455]. More specifically, Mr. Coleman's records show that he underwent an open reduction and internal fixation of the right ulna; a closed reduction of the right radial head; and application of a long synthetic immobilizer. (*Id.*, p. 101) [PageID.453].

Squier Decl. at PageID.342.

> Plaintiff was discharged from surgical care services on the evening of June 6, 2013.

*Id.* Dr. Squier authorized the following post-surgical treatment: on June 13, 2013, the doctor received and approved a consultation request for post-operative appointment and evaluation with the orthopedic surgeon, whom he saw on June 20, 2013; and on July 22, 2013, the doctor received and approved a consultation request for a second post-operative appointment and evaluation with the orthopedic surgeon, whom he saw on August 1, 2013. *Id.* at PageID.342-343. The orthopedic surgeon advised plaintiff on August 1st that he could resume normal activities but to avoid strenuous activities until further evaluation, which was recommended for six to eight weeks later. *Id.* at PageID.343; Medical Record at PageID.423, 460-462. Dr. Squier was not involved in the review of a request for a third orthopedic follow up visit. Squier Decl. at PageID.343-344.

In his response to Dr. Squier's motion, plaintiff filed two documents which he referred to as affidavits. *See* Coleman Affs. (docket nos. 43 and 45). However, these documents, which do not include a notary jurat or notary signature, are not affidavits sufficient to rebut Dr. Squier's declaration under Fed. R. Civ. P. 56(c)(4).[5] "The absence of a jurat or other evidence of verification requires a finding that the document fails to constitute an affidavit." *Knobloch v. Langholz*, No. 231070, 2002 WL 1360388 at *2 (Mich. App. June 21, 2002) (unpublished). "A purported affidavit, on which perjury could not be assigned if it was wilfully false, would not, in law, be an affidavit at all." *Kelley v. City of Flint*, 251 Mich. 691, 696; 232 N.W. 407 (1930), quoting *Clarke v. Wayne Circuit Judge*, 193 Mich. 33; 159 NW 387 (1916) (syllabus). In addition, neither of plaintiff's affidavits purported to be declarations under penalty of perjury executed pursuant to 28 U.S.C. § 1746. Accordingly, neither of these affidavits serve to rebut Dr. Squier's affidavit or plaintiff's medical records.

Based on this record, plaintiff's claim of deliberate indifference is not supported by either his medical records or the facts as stated in Dr. Squier's declaration, both of which reflect that Dr. Squier coordinated with the onsite medical provider, Dr. Nelson, to diagnose plaintiff's injury and then secure a surgical repair. In addressing Eighth Amendment claims, the Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976). "[W]here a prisoner has received some medical

---

[5] *See* M.C.L. § 55.265(a) ("'Jurat' means a certification by a notary public that a signer, whose identity is personally known to the notary public or proven on the basis of satisfactory evidence, has made in the presence of the notary public a voluntary signature and taken an oath or affirmation vouching for the truthfulness of the signed record").

attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004), quoting *Westlake*, 537 F.2d at 860 n. 5. While plaintiff disagrees with defendant Squier's medical judgment regarding the urgency of his condition, and wanted to have treatment contrary to that judgment, this disagreement does not rise to the level of a federal constitutional claim. *See Woodberry v. Simmons*, 146 Fed.Appx. 976, 977 (10th Cir. 2005) ("a difference of opinion between a prisoner and the prison medical staff about medical treatment does not constitute deliberate indifference"); *Owens v. Hutchinson*, 79 Fed. Appx. 159, 161 (6th Cir. 2003) ("[a] patient's disagreement with his physicians over the proper medical treatment alleges no more than a medical malpractice claim, which is a tort actionable in state court, but is not cognizable as a federal constitutional claim"); *Wright v. Genovese*, 694 F.Supp.2d 137, 155 (N.D.N.Y. 2010) ("[d]isagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment").

In addition, to the extent that plaintiff contends that Dr. Squier disagreed with Dr. Nelson's opinion regarding the urgency of plaintiff's treatment, this is not a basis for a constitutional claim. "Mere differences of opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996). *See also, Acord v. Brown*, No. 93-2083, 1994 WL 679365 at *2 (6th Cir. Dec. 5, 1994) ("a § 1983 claim based on the Eighth Amendment is not present when a doctor disagrees with the professional judgment of another doctor, as there are several ways to treat

illness"); *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990) ("[i]f a plaintiff's disagreement with a doctor's professional judgment does not state a violation of the Eighth Amendment, then certainly no claim is stated when a *doctor* disagrees with the professional judgment of another doctor") (emphasis in original); *Lazarus v. Abilittif*, No. 1:12-cv-1279, 2013 WL 1500658 at *1 (W.D. Mich. Apr. 10, 2013) (quoting *Estate of Cole by Pardue*).   Viewing the facts in the light most favorable to the non-moving party (plaintiff), Dr. Squier was not deliberately indifferent to plaintiff's serious medical needs in violation of his Eighth Amendment rights.   Accordingly, Dr. Squier's motion for summary judgment should be granted on this claim.

### 2.      Delay in treatment

Finally to the extent plaintiff claims that Dr. Squier was deliberately indifferent due to a delay in his treatment, this claim also fails.   Where a plaintiff alleges that a delay in treatment caused injury, he must show that the defendant was aware of his obvious and serious need for medical treatment and delayed the medical treatment of that condition for non-medical reasons. *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir.2004).   In such cases, to demonstrate that an alleged delay in medical treatment rose to the level of a federal constitutional violation, the plaintiff "must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed."   *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir.2001) (internal quotation marks omitted).

Dr. Squier's actions do not rise to the level of a constitutional violation.   Plaintiff's injury occurred on May 31, 2013.   The medical record reflects that plaintiff was under constant care from the time of his initial consultation during the early morning hours of June 1, 2013 through his surgery on June 6, 2013.   Dr. Squier became involved on June 3, 2013.   She authorized an x-ray on

June 5th, and authorized surgery on June 6th. In addition, plaintiff has not established that he suffered any adverse effect from an alleged delay in treatment. *See Blackmore*, 390 F.3d at 897-98. Plaintiff received a medical consultation with a nurse within minutes of reporting the injury, and his fracture healed appropriately with surgery. While plaintiff now complains that medical staff delayed his treatment, the record reflects that plaintiff minimized the extent of his injury: he waited several hours before reporting the injury to medical staff; he did not comply with treatment (e.g., plaintiff did not use his sling or take pain medication); and after the surgery he gave medical staff a different explanation for how he sustained the injury. Viewing the facts in the light most favorable to the non-moving party (plaintiff), Dr. Squier did not delay plaintiff's treatment in violation of his Eighth Amendment rights. Accordingly, Dr. Squier's motion for summary judgment should be granted on this claim.

## IV.     Recommendation

For these reasons, I respectfully recommend that defendants Dykstra, Rich, Smith and Stieve's motion for summary judgment (docket no. 28) be **GRANTED**, that plaintiff's motion for summary judgment (docket no. 32) be **DENIED**, that plaintiff's motion for deposition(s) (docket no. 37) be **DENIED**, that defendant Dr. Squier's motion for summary judgment (docket no. 38) be **GRANTED**, and that this action be **TERMINATED**.


Dated:  December 30, 2015          /s/ Ray Kent
                                   RAY KENT
                                   United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).